Filed 5/30/13  In re N.B. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re N.B., A Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>A.B.,<br><br>    Defendant and Appellant. | G047733<br><br>(Super. Ct. Nos. DP023081)<br><br>O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Deborah J. Servino, Judge.  Affirmed.

Brent Riggs, under appointment by the Court of Appeal, for Defendant and Appellant.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

Appellant (Mother) challenges the sufficiency of the evidence to support the juvenile court's jurisdictional and dispositional orders regarding her two-year-old son N.B. Finding substantial evidence to support the orders, we affirm.

FACTS

When N.B. was born in 2010, Mother was only 15 years old. Although she stopped using drugs at that time, she resumed using marijuana in 2011 and started using methamphetamine on a daily basis in early 2012. Father also has a history of drug use, as well as a criminal record. He separated from Mother after N.B. was born and is not a party to this appeal.

Since N.B. was born, his primary caretakers have been his maternal grandmother Elizabeth and her boyfriend Lee. They took N.B. and Mother into their home, and they also care for Mother's teenage brother Jason. Like Mother and Father, Elizabeth has used a variety of drugs over the years, and Jason was known to be a "pothead." Given all the drug use that was going on in N.B.'s family, it is hardly surprising that things were chaotic at his home. In fact, since N.B. was born, the police have been called out to the home about once a month for one thing or another.

Rather than going into all of the calls, we will simply describe the most salient ones. In December 2011, Elizabeth's former pimp broke into the house in the middle of the night and threatened Elizabeth at gunpoint. He stole $300 from her and threatened to kill her children if she did not come back to work for him.

In February 2012, Elizabeth was arrested after methamphetamine and drug paraphernalia were found in her bedroom. Elizabeth told the police she always kept her bedroom door locked, and N.B. did not have access to the room.

In March 2012, Mother ran out into the street in an apparent suicide attempt. When the police arrived, she admitted this was not the first time she had tried to kill herself. At the age of 13 she tried to hang herself and was briefly admitted to a psychiatric hospital. Mother claimed the hanging incident was merely "a plea for

2

attention." Although she was prescribed various anti-anxiety medications, she stopped taking them after a few months because she did not like the way they made her feel.

In April 2012, Mother got into a scrap with the paternal grandmother Debra after Mother tried to serve Father with custody papers. According to Mother, she kicked Debra in self-defense after Debra pushed her. However, Debra denied being the aggressor. She claimed Mother punched her in the head after she tried to take the custody papers away from her.

In May 2012, Elizabeth wanted to go visit Debra and Father. Mother didn't like that idea, so after Elizabeth got in her car, she stood behind it with N.B. in her arms to prevent her from leaving. After Lee moved Mother out of the way, she set N.B. down and began pounding on Elizabeth's car. Lee pushed her away from the car, and as they were fighting, they fell into the garage door. Lee claimed Mother punched him during the ordeal, and Mother said Lee kicked her, but no charges were filed in connection with the incident.

In July 2012, Mother came home around midnight to get a lighter. Elizabeth thought Mother was high, and upon finding a methamphetamine pipe in Mother's purse, she called the police. Mother was arrested for possessing drug paraphernalia but released the following day.

It was against this backdrop that N.B. was detained on September 28, 2012. That morning, Elizabeth dropped N.B. off at preschool, but later in the morning, the power went out at the school, so Mother returned and picked him up. When they got home, Mother and Elizabeth started fighting. The police were called, and when they arrived, Elizabeth consented to a search of the house.

On the kitchen counter, the police noticed a makeup bag sitting next to some children's clothing. When they searched the bag, they found three methamphetamine pipes, which Mother admitted belonged to her. She said she used

3

methamphetamine regularly and also smoked marijuana once in a while. However, she insisted she never brought any drugs into the house.

When questioned by the police, Elizabeth admitted she had been smoking marijuana earlier that morning. She said she smoked every morning after N.B. went to school and at night after he went to bed. She also produced a medical marijuana card that appeared to be valid. She admitted knowing Mother used methamphetamine but claimed there was nothing she could do about it because she had "no control over her daughter." Elizabeth also admitted to using methamphetamine but claimed she had not done so in several months.

As for N.B., he appeared to be fine. Although he suffers from asthma, there was no indication he was being neglected or mistreated. However, the officers, in consultation with a social worker, felt the home was unsuitable for a two year old. Therefore, they detained N.B. and placed him in a foster home, where he remains to this day. Mother was arrested and taken into custody, but she was released later that night. The next day, the police were again called out to the house, due to a dispute between Mother and Elizabeth. The responding officers discovered Elizabeth had kicked holes in two of the bedroom doors. They convinced Mother to leave the house until she and Elizabeth both had a chance to cool down.

A few days later, Mother told the social worker she first started using marijuana when she was 13 years old and had been using methamphetamine on a daily basis for the past eight months. However, she claimed she had never used drugs or been under the influence around N.B. Describing the dynamics in the household, she said that both she and Elizabeth are bipolar and have anxiety issues. And although Elizabeth helps her out a lot with N.B., she said she hates her mother because she is "fucked up in the head" and verbally abuses her. She also said Elizabeth and Lee argue and yell at each other a lot.

4

Elizabeth told the social worker she has an extensive narcotics history and has pretty much "done it all" when it comes to drugs. However, she said she completed a rehabilitation program in 2011 and limits her drug use now to medicinal marijuana. Although she uses marijuana daily, she said she never smokes or is under the influence around N.B. because she has to take care of him most of the time. She said Mother helps out with N.B. once in a while, but Mother has been on such a drug binge lately that she and Lee essentially raise the child by themselves.

When the social worker asked Father about Mother and Elizabeth's relationship, he said they have "'gnarly fights'" when they are "'coming down from [methamphetamine].'" He denied any physical fighting between them but said Mother would sometimes get Elizabeth so angry that she would punch holes in the wall of their home. The record also shows Mother often fought with her brother Jason. In fact, the police were called to the home several times to stop them from fighting.

On October 3, 2012, the juvenile court found sufficient grounds to detain N.B. and granted Mother monitored visitation for two hours twice a week. At the hearing, Mother's attorney claimed that since N.B. was detained, Mother had attended one Narcotics Anonymous (NA) meeting and "has hit the ground running with respect to sobriety."

Over the course of the next few weeks, N.B. was reported to be happy and healthy in his foster home. Elizabeth was considered a possible candidate for placement, but citing her "past history," she refused to provide any clearance information to the social worker. Mother told the social worker it was "an eye opener" for N.B. to be taken away from her. She said she has been sober since then, and her anxiety has gone down because she is no longer using drugs. She also said she has enrolled in a perinatal program. As part of the program, she had begun attending parenting and NA classes and working on a 12-step program. She also started attending group therapy and undergoing drug testing. As expected, her first few drug tests were positive, due to her past drug use,

but since then her tests have all been negative. Her counselor reported she was adjusting to the perinatal program and beginning to open up during her therapy sessions. She was described as cooperative and willing to participate in services.

Visitation with N.B. was somewhat of a mixed bag. The visits were monitored by N.B.'s foster mother and also attended by Elizabeth and Lee at times. During one of the visits, Mother brought along her boyfriend, even though he was not an authorized visitor at that time. Mother also had trouble handling N.B. at times and often gave him candy to get him to behave. And on one visit, Mother left early, saying she had to catch a bus. Early on in the case, the foster mother reported Mother "doesn't have any parenting skills as far as I can see." However, she subsequently reported that Mother was doing "OK, not bad" with N.B. Elizabeth tended to be rather erratic when she attended the visits, so her visitation time was reduced. N.B. seemed happy to see his mother during the visits and cried when she left. However, after about five minutes, he was fine.

During this period, Mother told the social worker she was looking for work and hoping to enroll in community college. However, she was still living with Elizabeth and Lee and relying on them for support. The social worker expressed concern that, in light of past events, this environment might not be conducive for Mother to overcome her problems. She did not believe Mother was ready to have N.B. returned to her at this time.

At the jurisdiction hearing on November 15, 2012, Mother submitted on the social worker's reports, and Father pleaded no contest. The juvenile court determined there was sufficient evidence to support the allegation the parents had failed to protect N.B. and he was at substantial risk of serious physical harm due to their inability to do so. Therefore, it assumed jurisdiction over N.B. and set a disposition hearing two weeks out.

During that fortnight, Mother continued to participate in her perinatal program and visit N.B. regularly. Taking Mother's lead, Elizabeth also enrolled herself in a drug treatment program. She admitted using methamphetamine in the wake of

6

N.B.'s detention but claimed that, other than using marijuana for medicinal purposes, she was committed to maintaining a sober lifestyle. Father displayed no such ambitions; he repeatedly tested positive for drugs and failed to show up for many of his scheduled visits with N.B.

At the disposition hearing on November 28, 2012, Mother testified she was scheduled to begin community college in January 2013. Describing her progress in her perinatal plan, she said she had completed seven substance abuse classes, four general counseling sessions and meets regularly with her NA sponsor and her guidance counselor. She is halfway through the first step of her 12-step program. She also has completed four parenting classes and attends self-help meetings whenever she can.

Mother said the parenting classes have taught her how to set boundaries with N.B. and communicate with him more effectively. She said she is surrounding herself with sober people and cutting the bad people out of her life. Although she admitted she has had problems with Lee in the past, she denied having any serious disagreements with Elizabeth. In fact, she said she and Elizabeth get along "perfectly" now. Mother also denied ever being under the influence around N.B. She said she understands that drug use can impede a person's parenting skills. And while she wants N.B. returned to her care, she has learned from her treatment that it usually takes about four to six months in treatment before a person is "good" and "solid" and has a "good grasp" on their sobriety.

Elizabeth testified she was N.B.'s primary caretaker before he was detained. She admitted to an extensive history of drug use but claimed she only used methamphetamine once after N.B. was detained, and before then, she had not used in about two years. She is currently enrolled in a nine-month treatment program that includes substance abuse, parenting and anger management classes. She said the program has taught her how to communicate better with Mother and to live a healthier

lifestyle. Although she still uses marijuana, it is doctor recommended to help alleviate her anxiety.

At the conclusion of the disposition hearing, Mother's attorney asked that N.B. be returned to Mother under a family maintenance plan. However, county counsel and N.B.'s attorney urged the court to keep N.B. in foster care and authorize continued reunification services for Mother and Father, which is what the juvenile court decided to do. While acknowledging Mother appeared to love N.B. very much, the court determined it was in N.B.'s best interest to remove him from her care. It denied Mother's request for return and set the matter for a six-month review hearing on May 28, 2013.

I

Mother contends there is insufficient evidence to support the juvenile court's decision to establish jurisdiction over N.B. We disagree.

"In juvenile cases, as in other areas of the law, the power of an appellate court asked to assess the sufficiency of the evidence begins and ends with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact." (*In re Katrina C.* (1988) 201 Cal.App.3d 540, 547.) In making this determination, "[w]e do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.) Rather, we give respondent "the benefit of every reasonable inference" and resolve all conflicts in favor of the trial court's decision. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)

In this case, the juvenile court assumed jurisdiction over N.B. pursuant to Welfare and Institutions Code section 300, subdivision (b). Under that section, jurisdiction is justified if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child[.]" (Welf. & Inst. Code, § 300, subd. (b).) The statute is designed not only to protect child who have been abused

8

or neglected but "'to ensure the safety, protection, and physical and emotional well-being of children *who are at risk of that harm*.'  [Citation.]  'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.  [Citation.]"  (*In re I.J.* (May 9, 2013, S204622) __ Cal.4th __, __.)

Despite all her past problems, Mother claims respondent failed to prove that, at the time of the jurisdiction hearing, N.B. was at substantial risk of serious physical harm due to her failings.  While she admits having drug, mental health and family issues, she insists there is no evidence they jeopardized N.B.'s physical well-being or impeded her ability to care for him.

In so arguing, Mother compares herself to the parents in *In re Destiny S.* (2012) 210 Cal.App.4th 999 and *In re Drake M.* (2012) 211 Cal.App.4th 754, whose drug use was found not to warrant juvenile court jurisdiction over their children.  However, in the latter case, there was no evidence the father was a drug *abuser*.  In fact, his authorized use of medical marijuana was so circumspect that it never interfered with his work, caused him legal problems or hampered his ability to care for his son.  (*Id.* at pp. 763-769.)  And while the mother in the former case did use "hard drugs," she remained a positive force in her daughter's life, kept their home free of drug paraphernalia, and already had three months of sobriety under her belt by the time of the jurisdictional hearing.  (*In re Destiny S., supra,* 210 Cal.App.4th at pp. 1002-1005.)

Mother's drug use was much more serious and deleterious than the parents in these two cases.  Not only did she use marijuana on occasion, she was so addicted to methamphetamine she could hardly make it through the day without a hit.  Indeed, Elizabeth reported Mother was on such a binge around the time N.B. was detained that she and Lee had to assume nearly all of his childcare responsibilities.  And while Mother said she never used drugs or was under the influence around N.B., she did bring drug paraphernalia into the home and was twice arrested at the house for having methamphetamine pipes in her possession.  Elizabeth, a long time drug user, was also

9

arrested for having methamphetamine and drug pipes at the house. And by the time of the jurisdictional hearing, neither Mother nor Elizabeth had been in drug treatment very long. In fact, less than a month had passed since Mother first tested clean.

What's more, substance abuse was not Mother's only problem. Like Elizabeth, she is bipolar and suffers from anxiety, yet she shirked the medications that were prescribed for her. In 2008, she was hospitalized for attempting to commit suicide, and she tried to kill herself again, by running out into the street, just six months before N.B. was detained. While Mother downplays the volatility in the household, her fighting with Elizabeth, Lee and Jason led to police intervention on multiple occasions. And unfortunately, N.B. was sometimes in the mix of things when tempers flared. For example, during the incident on May 7, 2012, Mother was holding N.B. in her arms when Lee physically moved her out of the way of Elizabeth's car. Then, after Mother put N.B. down, she and Lee got into a physical altercation right there in the driveway. Aside from the obvious physical danger this posed to N.B., it must have been traumatic for him to see his family engaging in such violent behavior.

While there is no evidence N.B. was ever physically harmed or neglected, the law "does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction." (*In re I.J., supra,* __ Cal.4th at p. __.) Rather, the evidence need only show there is a "'substantial risk' that the child will be abused or neglected." (*Ibid*.) And although "previous acts of neglect, standing alone, do not establish a substantial risk of harm" (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 565), the court may properly consider conduct that predates the jurisdictional hearing in assessing the risk of harm to the child. (*In re Janet T.* (2001) 93 Cal.App.4th 377, 388; *In re Rocco M.* (1991) 1 Cal.App.4th 814, 824.) Based on the evidence in this case, the juvenile court could properly infer N.B. was presently at risk of serious physical harm due to Mother's history of drug use and unstable behavior. We therefore uphold its assumption of jurisdiction over N.B.

10

## II

Mother also contends there is insufficient evidence to support the juvenile court's decision to remove N.B. from her care. Again, we disagree.

Pursuant to Welfare and Institutions Code section 361, subdivision (c)(1), the juvenile court may remove a dependent child from his parents' custody upon clear and convincing evidence of a substantial danger to the child's physical health or well-being if there are no other reasonable means to protect the child. Such an order "is proper if it is based on proof of parental inability to provide proper care for the minor and proof of a potential detriment to the minor if he or she remains with the parent. [Citation.] The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child. [Citations.]" (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136, overruled on other grounds in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 736.)

This standard has obvious parallels to the jurisdictional issue discussed above. Indeed, the juvenile court's jurisdictional findings are prima facie evidence the child cannot safely remain in his or her parent's home. (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146 (*Hailey T.*).) Nevertheless, Mother argues N.B.'s removal was unjustified because he could have safely remained in her care under a family maintenance plan. In so arguing, Mother relies on *Hailey T.*, but that case is inapt.

In *Hailey T.*, the juvenile court's removal order with respect to a four-year-old girl was reversed because the cause of her infant brother's injuries were the subject of sharp dispute, her parents had a good relationship, they did not have any substance abuse problems and "there was no evidence [they] suffered from mental health conditions, developmental delays or other social issues that are often at the root of dependency cases and might place children at continuing risk in the home." (*Hailey T., supra*, 212 Cal.App.4th at p. 147.)

11

In contrast to the parents in *Hailey T*., Mother is afflicted with a variety of problems that have impaired her ability to care for N.B.  A single teenage mother with mental health issues, she was addicted to drugs and overwhelmed with the prospect of caring for N.B.  Elizabeth and Lee did their best to take up the slack, but the dynamics of the household were simply not conducive to raising a two year old.  The fighting and the drug use among N.B.'s family members led to police involvement on many occasions, and although Mother and Elizabeth have begun substance abuse treatment, the case is still young.  In light of their past drug abuse and everything else that has happened in the home since N.B. was born, the juvenile court was justified in removing him from Mother's care.  Because the court's removal order enjoys substantial evidentiary support, we are powerless to disturb it.

## DISPOSITION

The juvenile court's jurisdictional and dispositional orders are affirmed.




                                    BEDSWORTH, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


THOMPSON, J.

12